CURTIS JAMES JACKSON,
p/k/a 50 CENT,

      Plaintiff,

vs.

GRUPO INDUSTRIAL HOTELERO,
S.A., a Mexican Corporation d/b/a
"COCO BONGO" nightclub, ROBERTO
NOBLE, SR., and ISAAC HALABE,

      Defendants.

_____/



## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT

This case involves an action by Plaintiff, Curtis James Jackson ("Jackson") a/k/a 50 Cent, against Defendants, Grupo Industrial Hotelero, S.A. ("Grupo"), Roberto Noble, Sr. ("Noble"), and Isaac Halabe ("Halabe") for damages for violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*; Florida Statutes § 540.08; and common law unfair competition and trademark infringement. On January 29, 2009, Magistrate Judge John J. O'Sullivan, upon the parties' stipulation, entered an Agreed Order on Defendants' Violation of Judge O'Sullivan's January 22, 2009 Order (D.E. #138), striking all of the Defendants' pleadings related to liability. By operation of the Agreed Order, all of Plaintiff's well-plead allegations in his Complaint related to liability are established as true. This meant that Defendants' liability for willful infringement was no longer at issue, leaving only the question of Plaintiff's damages, if any, for determination at trial.

The case came before the Court for a non-jury trial on the issue of damages on March 2, 3, and 20 of 2009. The Court considered the testimony of seven witnesses (both in court and through deposition transcripts), reviewed the exhibits admitted into evidence, the multiple memoranda of law submitted by the parties, the joint pretrial stipulations, and the parties' respective findings of fact and conclusions of law. Having considered the evidence and being otherwise fully advised in the premises, the Court hereby enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDING OF FACTS

### The Parties:

1.  Plaintiff Jackson is a United States citizen and a well-known entertainer.

2.  Defendant Grupo is a Mexican corporation with its principal place of business in Cancun, Mexico. Grupo owns and manages the Coco Bongo nightclub in Cancun, Mexico.

3.  Defendant Noble is an individual residing in Cancun, Mexico. Noble owns the Coco Bongo nightclub and is shareholder of Defendant Grupo.

4.  Defendant Halabe, a resident of Cancun, Mexico, is the Director Generale of Grupo. Defendant Halabe receives a fixed salary for his services to Grupo, and does not receive any profits from Grupo as compensation.

### Jackson's Likeness and the G-Unit Trademark:[1]

5.  Jackson enjoys world-wide notoriety and fame. As a result of his fame, Jackson's image and likeness[2] are widely recognized, giving them substantial monetary value in the marketplace.

6.  In addition to being a solo recording artist, Jackson is a member of the rap and hip-hop group known as "G-Unit." In 2003, Jackson created the G-Unit Clothing Company, which

---

[1] The Court notes here, and more fully discusses below in the Conclusions of Law section, that Jackson brings his claims for infringement of the G-Unit trademark under the Lanham Act, and brings his claims for the unauthorized publication of his likeness pursuant to Florida Statutes, section 540.08. This distinction is important in this case because the Lanham Act, unlike Florida Statutes, section 540.08, provides for an award of the Defendants' profits under certain circumstances which are present here. This award of profits, therefore, is limited to *only* the profits arising from the unauthorized use by Defendants of the G-Unit mark, and not from the unauthorized use of Jackson's likeness. As the Court discusses below, the Court finds that Jackson's image and likeness have a value far exceeding the value of the G-Unit trademark. The Court is mindful that any award of profits must be constrained to the unjust enrichment received by Defendants through the unauthorized use of the G-Unit mark alone. Accordingly, when awarding damages in this case, the Court has been aware of the need to differentiate between those awarded for the infringing use of Plaintiff's likeness and those for the infringing use of the G-Unit trademark.

[2] Throughout this Order Memorandum, the Court uses, as have the parties, the terms "likeness" and "image" interchangeably. The infringing advertisement was not a photorealistic image of Jackson, but a likeness created, in part, with the aid of a computer. In this case, however, it makes no difference as the likeness is unmistakably that of Jackson as 50 Cent.

is marketed and promoted under his trademark G-Unit.

7.  Jackson owns various federal trademark registrations for the G-Unit mark including: U.S. Registration No. 2787451 for entertainment services in the nature of live performances by the musical group in International Class 041; for pre-recorded phonograph records, compact discs, audio and video cassettes, and DVDs featuring music in International Class No. 09; and clothing, namely, hats, t-shirts, jackets, shirts, sweatshirts and sweat pants, and jerseys in International Class No. 25. Jackson also owns U.S. Registration No. 2992615 for the G-Unit mark for printed matter and publications, namely, newsletters relating to entertainment; photographs; posters; and pressure sensitive stickers in International Class No. 16.

8.  Jackson has successfully parlayed his fame as a musical artist into a significant revenue stream endorsing others' products and services through use of his likeness and G-Unit mark.

9.  Jackson has not been a passive participant in the cultivation of his image and G-Unit mark. Jackson has been active in developing and protecting his image and trademarks from early in his career. In fact, Jackson used the proceeds of his first advance from a major record company to register his trademarks, and has continued to emphasized branding and the growth of his trademarks and endorsement opportunities as part of a long-term business plan. The Court finds that Jackson has been very careful to develop his image and career in a manner which maximizes the value of Curtis James Jackson as 50 Cent and his associated trademarks. To put it another way, the high value of Jackson's image and likeness, as well as the G-Unit trademark, is not by accident. Jackson has consciously worked to expand and protect the value of his brand.

10.  Jackson has established by testimony and documentary proof that his image and the G-Unit trademark are highly sought after for licensing deals because of the value of their association. Plaintiff and the G-Unit trademark have been licensed to endorse several products and services, including, clothing, sneakers, cars, beverages, video games, satellite radio, and body fragrances.

11.  A substantial portion of Jackson's income is derived from commercial endorsements. By 2007, he had earned cumulatively in excess of $150 million from endorsement deals. In 2007, he was commanding his strongest deals in the marketplace up to that point in time. Jackson has shown that by 2007, one third to one half of his income was derived through branding ventures as

opposed to recorded music, music publishing, live touring, and movies and television.[3]

12. Jackson's likeness and his G-Unit trademark have immense commercial value. However, although Jackson's G-Unit mark is very valuable, the Court finds that his image and likeness are far more sought after and have a far greater value than the G-Unit mark, particularly in the context presented here. The Plaintiff, himself, stated that his image was of greater value than his G-Unit mark, and the Court finds that the infringing advertisement corroborates this. In the infringing advertisement, the likeness of 50 Cent is far more prominent, with the G-Unit trademark generally only partially displayed. In fact, in some places, such as the use of the infringing advertisement in the video, the G-Unit mark is barely noticeable. The Court finds that it is Jackson's likeness as 50 Cent that the Defendants were most eager to exploit, and that the G-Unit trademark, if anything, merely enhanced the likeness of 50 Cent.

13. Jackson has been selective as to the products or services he chooses to endorse. To date, he has not endorsed a nightclub, but indicated that he may in the future.

### Defendants' Infringement:[4]

14. Defendants, knowingly and without the authorization, permission, or consent of Jackson, have appropriated and used his likeness and the G-Unit mark to deliberately advertise, promote, endorse and draw attention to the Coco Bongo nightclub without regard for the rights of Plaintiff, including his federal trademark rights and the right to control and direct the use of his image and likeness.

15. Specifically, Defendants knowingly and intentionally advertised a promotion for Spring Break 2007 using Jackson's likeness and the G-Unit mark ("Infringing Advertisement").

16. The image of the Plaintiff's G-Unit mark and his likeness were used as part of a

---

[3] Jackson appeared on the cover of Forbes Magazine's July, 2004 "Celebrity 100" issue, containing an article ranking the top-100 "hottest movie starts, musicians, and athletes" in which Jackson was ranked number eight. Jackson also testified that in the current year's issue he is listed as number two on the top-100 list.

[4] As noted above, Defendants' pleadings as to liability were stricken pursuant to the Agreed Order entered by Judge O'Sullivan. Accordingly, all related well-pled factual allegations of the Complaint are established as true. *See Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987).

cross-promotion with Microsoft promoting its XBOX gaming systems on Friday nights called, "Friday Action Night," which was held at the Coco Bongo nightclub in Cancun on six nights, March 2, 2007, March 9, 2007, March 16, 2007, March 23, 2007, March 30, 2007 and April 6, 2007.

17.     The Infringing Advertisement appeared on Defendants' official internet website www.cocobongo.com.mx through at least the 2007 Spring Break season (from February 22, 2007 through at least April 6, 2007).

18.     The Infringing Advertisement contains a likeness of Jackson wearing a hat and t-shirt with the G-Unit mark along with the words "Action Night, XBOX 360 Spring Break 2007." The Infringing Advertisement also appeared under the section of the website entitled "calendar."

19.     In some parts of the website where the Infringing Advertisement appears, Jackson's likeness and mark are only partially visible. In every case, the likeness of Jackson is featured far more prominently than his G-Unit mark.

20.     The Infringing Advertisement appears as part of a scrolling advertisement. The Infringing Advertisement is one of seven unique panels, each advertising a Coco Bongo event on a particular night of the week. This scrolling advertisement changes approximately once every five seconds, transitioning from one panel to another. Each panel promotes a certain product or theme on a specific night of the week. The advertisement includes three panels promoting Microsoft's XBOX 360 (Wednesday, Friday, and Sunday nights), one panel promoting a theme captioned "Next" (Monday night), one panel promoting "Dos Equis XX in the Wild" (Tuesday night), one panel promoting a Mardi Gras theme (Thursday night), and one panel promoting something called "Bling Bling" (Saturday night). The sequence of these promotional panels repeats indefinitely.

21.     In addition to incorporating the Infringing Advertisement into the scrolling advertisement, Defendants have utilized the Infringing Advertisement in a video entitled "Spring Break 2007 in Cocobongo" ("Infringing Video") to promote the nightclub, which Defendants have distributed and made available on its official internet website www.cocobongo.com.mx and on various popular third-party websites such as youtube.com and google.com.

22.     Much like the scrolling advertisement, the Infringing Video consists of seven panels, each promoting a different night. The Friday panel is a copy of the Infringing Advertisement, showing Jackson's likeness and the G-Unit mark on his t-shirt and hat. Like the scrolling

5

advertisement, the likeness of Jackson and the G-Unit mark is on screen for approximately five seconds. Unlike the scrolling advertisement, however, the Infringing Video does not automatically repeat.

23.     The Infringing Video appeared, through at least August 9, 2007, on the YouTube.com website, which was also accessible by clicking a link on Defendants' website, "Click On You Tube," which takes the user to www.youtube.com/cocobongovip, Defendants' exclusive account (cocobongovip) on youtube.com.

24.     The Infringing Video also appeared, through at least August 9, 2007, on the AOL Video website, and during the 2007 spring break season, on Video.google.com.

25.     Hundreds of millions of people have access to the content posted on Coco Bongo's website as well as there third-party websites. However, the actual number of visitors to these websites is unknown. Also unknown is how many visitors to these websites actually viewed Plaintiff's likeness or his G-Unit mark.

### The Effect of the Infringement:

26.     Defendants' Infringing Advertisement and Infringing Video containing Jackson's likeness and the G-Unit mark are false representations to the public that Jackson and G-Unit endorse, are employed, sponsored, associated or affiliated with, or otherwise approve of Defendants, the Coco Bongo nightclub and business activities.

27.     During the period when Plaintiff's likeness and trademark were displayed, Defendants received the benefit of creating an association between Plaintiff and Defendants' nightclub to attract customers to the club, without compensating Plaintiff and without his approval.

28.     Defendants gained pecuniary benefit from the unauthorized use of 50 Cent's likeness to advertise the Coco Bongo nightclub.

29.     Plaintiff has suffered a loss by the Defendants' use of his likeness and trademark to endorse the Coco Bongo nightclub. Plaintiff has been denied the right to control the commercial use of his identity and his G-Unit mark. Further, Defendants have forced Plaintiff into an endorsement in a commercial sector where Plaintiff has not yet entered.

### The Value of the Infringement: Plaintiff's Likeness and the G-Unit Mark:

30.     As stated above, Jackson's image and likeness are significantly more valuable than his G-Unit mark.

31.     Here, the G-Unit mark and Jackson's likeness are always displayed together. Jackson

appears in the Infringing Advertisement wearing the G-Unit mark on his clothing. Although the G-Unit mark has value on its own, Jackson's likeness is always present with the G-Unit mark which diminishes the importance of the G-Unit mark in the advertisement.

32. Spring Break is the busiest and most profitable time at the Coco Bongo nightclub.

33. The value of Defendants' use of the Plaintiff's likeness and the G-Unit mark diminished after April 6, 2007 when Spring Break and the Act on Night promotion ended, having only diminishing, residual value thereafter.

34. To aid the Court in determining the value of Defendants' infringing use of Plaintiff's likeness and mark, Plaintiff presented evidence of various endorsement agreements that are generally more sophisticated and extensive, and substantially more complex and detailed regarding the use of Plaintiff's likeness and mark than the use to which Defendants put Plaintiff's likeness and mark. Here, Plaintiff does not provide a close, analogous template agreement for the Defendants' use of Plaintiff's likeness and mark. However, these agreements do have elements or factors which provide the Court with some guidance in arriving at a reasonable license fee here.

35. Many of the endorsement agreements provided by Plaintiff relate to the sale of specific products based largely on the association or branding by Jackson's likeness or his G-Unit trademark, with Plaintiff receiving a percentage of the product sales. For example, in one commercial endorsement deal presented by Plaintiff for the use of his G-Unit mark, the royalty rate was 10% of net sales of the product. The product was branded with the G-Unit symbol and one could reasonably attribute the sales of that product in large part to the association with and the branding of the G-Unit mark. In the present case, no specific products were sold bearing Jackson's likeness or the G-Unit mark, making a royalty based on a percentage of direct sales problematic.

36. To counter the examples of the commercial endorsement agreement submitted by Plaintiff, Defendants presented evidence of a license to use a copyrighted cartoon characters, widely known in Mexico but admittedly largely unknown in the United States, for use on their website and on merchandise sold at the Coco Bongo nightclub. That agreement provided for a 12% royalty based on net sales of products bearing the licensed cartoon characters. Again, no products bearing Jackson's likeness or the G-Unit trademark were sold in this case, thus limiting the unusefulness of Defendants' evidence.

37. Defendants also presented evidence of a license that was entered into by Grupo as a result of its prior infringement and of a digital transmission license, neither of which the Court

7

considers to be particularly relevant to the issue of the value of a licensing fee in this case.

38.     Plaintiff's transactional attorney, Theodore Sedlmayr, testified that, based on his knowledge and experience in representing entertainers, the amount Plaintiff seeks in this case is lower than the endorsement fees generally granted in the nightclub industry.

39.     Sedlmayr detailed several factors he considered when determining what is a reasonable licensing fee for the use of Plaintiff's likeness and the G-Unit mark in this case. Those factors included, among others:

> The capacity of the venue, the advertising budget for Coco Bongo in connection with the time period of the promotion, the profit margins of the Coco Bongo nightclub, the demographics of the venue's patrons, the venues financial records over the previous three years, the ability in an equity stake in the company, the value of the Plaintiff's likeness and the G-Unit trademark to the company, the value of Plaintiff's goodwill, the geographic scope of Defendants' use of Plaintiff's likeness and the G-Unit mark, previous uses in the same market, the geographic location of the Coco Bongo nightclub, exclusivity of the use, the length of use, Plaintiff's business philosophy (including obtaining an equity interest in the company), the sustainability of the product or service for which the license is being used, the quality of the brand being endorsed, the timing of the endorsement, whether the endorsement of the product or service helps to promote other ventures, what Plaintiff normally charges for similar endorsements, the terms of payment (an advance with continuing payments versus a flat fee), the ability of competitive bidding, and what deliverables would be required of Plaintiff.

40.     In his proposed valuation, Plaintiff claims that he seeks in this case a relatively lower license fees for the use of his likeness and trademark than he has shown he was capable of commanding by 2007. In arriving at his proposed valuation, Plaintiff took into consideration the differences between the Defendants' use of Plaintiff's likeness and mark here and the uses in his larger, more sophisticated endorsement agreements. Plaintiff, for example, does not anticipate receiving any sort of equity stake in this case, whereas such equity shares are generally included in the commercial endorsement agreement he has entered into since approximately 2007. However, as stated above, these more extensive, more sophisticated endorsement agreements are so unlike the situation here that they are of limited assistance in valuing Defendants' unauthorized use of

Plaintiff's likeness and his G-Unit mark in this case. The Defendants' infringing use of Plaintiff's property was such that Jackson's likeness and the G-Unit mark were not the predominant focus of any marketing campaign. Rather, unlike the endorsement agreements submitted by Plaintiff, here the Plaintiff's likeness and G-Unit mark were used as a small part of a broader advertisement campaign promoting Spring Break 2007 at the Coco Bongo nightclub, which, in turn, was only part of Coco Bongo's larger advertising efforts.

41.    As a matter of practical commercial reality, the Court finds that an internet advertising campaign cannot be restricted to one state. In light of this practical reality, the endorsement fees charged for the use of Plaintiff's likeness and the G-Unit mark on the internet do not vary based on the geographic area. In other words, had Plaintiff had the opportunity to negotiate an agreement with Defendants for an internet advertisement, Plaintiff would have negotiated a deal giving Defendants a nationwide, if not a worldwide license.

42.    Plaintiff's transactional attorney testified that, in his opinion, Plaintiff could have commanded a license fee in the range of $750,000 to $1,250,000 for the use of his Plaintiff's likeness and $500,000 to $750,000 for the use of Plaintiff's G-Unit mark as used by Defendants.

**Profits Under the Lanham Act for Infringement of the G-Unit Mark:[5]**

43.    The Coco Bongo nightclub is located in the most densely populated and most visited tourist and entertainment areas in Cancun. Both before and after Spring Break 2007, Coco Bongo

---

[5] The Court again notes that Jackson's likeness has far greater value than the G-Unit mark. As explained in footnote 1 above and in the Court's conclusions of law below, profits in this case are only available for the infringing use of the G-Unit mark and not for the use of Plaintiff's likeness. This creates tension in this case because the infringing use of Plaintiff's likeness, to the extent that it contributes to the profits generated at the Coco Bongo nightclub, is a greater contributing factor than is the use of the G-Unit mark. Ironically, this means that the infringing use of Jackson's likeness actually reduces the profits attributable to the use of the G-Unit mark alone. The Court acknowledges the difficulty in separating the effects of each infringement, and is conscious that where it is impossible to isolate the profits which are attributable to the use of the infringing mark it is the infringer, rather than the innocent party, who must shoulder the loss. *See Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 206-07 (1942). The Court is equally aware, however, that the Lanham Act provides for an equitable approach to the award of damages, and the Court must always fashion an award that serves the equitable purpose of the statute given the particular circumstances of each case. 15 U.S.C. § 1117(a) ("If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.").

was ranked as one of, if not the most popular entertainment tourist spots in Cancun, and has been for many years. Coco Bongo owes much of its popularity to its location, longevity, reputation, and unique concept of combining a nightclub with a cabaret.

44.     Defendants advertise the Coco Bongo nightclub extensively in and around Cancun, Mexico. Advertisements include brochures at hotels, billboards and signs at the airport, and advertisements inside taxicabs.

45.     Defendants also advertise and promote the Coco Bongo nightclub by distributing advertisements within the United States, including through its official internet website www.cocobongo.com.mx.

46.     The presence and distribution of the Coco Bongo nightclub website on the internet is extensive and sophisticated through both its appearance on various search engines and its having been directly linked to numerous other websites, including travel-oriented websites and social networking sites.

47.     Coco Bongo has contractual relationships with Google and Yahoo pursuant to which Coco Bongo pays money in order to obtain a high placement on those search engines.

48.     Being one of the largest tourist draws in Cancun, many of the different travel agencies and travel-related websites describe Coco Bongo as a premier destination in Cancun. Many of these travel-related websites refer their website visitors to Coco Bongo's official website.

49.     During the period of Defendants' use of Plaintiff's G-Unit mark, Defendant Grupo earned revenues through sales of admission passes to its Coco Bongo nightclub, sales of liquor in the nightclub, and other revenue associated with the operation of a busy nightclub.

50.     Many factors attributed to the net profits earned by Defendant Grupo, including Coco Bongo's reputation and goodwill; its location among other nightclubs on the Cancun strip; its unique concept as not only a nightclub, but also as a cabaret; and its extensive advertising efforts unrelated to Plaintiff.

51.     The Court finds that the above factors, including the infringing use of Plaintiff's likeness, contributed far more to the profits of the Coco Bongo nightclub during the period from February 22, 2007 to September 1, 2007 than did the infringing use of Plaintiff's G-Unit trademark.

52.     More than half of Coco Bongo's customers are United States tourists. The record in this case does not support any exact percentage, however the parties agree that the percentage of tourists from the United States is less than 100%. Defendant Halabe, testifying on behalf of Grupo,

10

stated that although he did not know the exact percentage of Coco Bongo's customers from the United States, the percentage of tourists from the United States at Coco Bongo's main competitors was anywhere from 60 to 70 percent. The Court determines that the mid-range of 65% is a fair percentage of United States tourists to which Coco Bongo's profits can be attributed.

53.     Based on the information provided by Defendants and utilizing the conversion rate for each month of the period, the Court finds that the Coco Bongo nightclub generated a total of $4,654,846.53 in sales for the period of February 22, 2007 through September 1, 2007.

54.     After deducting the ordinary expenses incurred in the operation of the Coco Bongo nightclub, the Court conclude that the nightclub's profits during the period from February 22, 2007 through September 1, 2007 was $410,010.70.[6]

55.     As stated above, the Court find that 65% of the profits made by Coco Bongo during the infringing period can be attributed to patrons from the United States, therefore, the Court finds that $266,506.96 represents profits attributable to United States tourists in this case. However, as stated above, the Court finds that many other factors other than the Infringing Advertisement contributed to the profits earned during the period of infringement.

56.     The Court also finds credible evidence that Defendant Halabe has not earned any revenues or profits from the unauthorized use of Plaintiff's G-Unit mark. The Court further finds that Defendant Noble did share in profits received by Defendant Grupo through its operation of the Coco Bongo nightclub.

## CONCLUSIONS OF LAW

**Jurisdiction:**

The court has subject-matter jurisdiction under 28 U.S.C. § 1338 (trademarks and unfair competition) and supplemental jurisdiction under 28 U.S.C. § 1367. The Court has personal jurisdiction pursuant to Federal Rule of Civil Procedure 4.[7]

---

[6] Plaintiff argues that certain of Defendants' deductions should not be allowed. One such expense is the salary of Defendant Halabe who oversees the day-to-day operations of the Coco Bong nightclub. The Court finds his salary to be reasonable and an ordinary expense incurred in the operation of the nightclub. While Halabe may be liable for infringement in this case, Plaintiff has not shown a legal basis for a disgorgement of Halabe's salary simply because he is liable for Plaintiff's actual damages.

[7] For a detailed analysis of the Court's jurisdiction over this matter, *see* the Court's Order on Defendants' Motion to Dismiss and Motion to Strike (D.E. #36).

**Liability for Infringements:**

As established by the striking of Defendants' pleadings as to liability, the Defendants intentionally, knowingly, and without authorization used Plaintiff's likeness and trademark to purposely create a false association between Plaintiff and Defendants' nightclub without regard for Plaintiff's rights. *See Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987); *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1379 (Fed. Cir. 2004).

The Defendants are liable to the Plaintiff for trademark infringement under the Lanham Act. (On the facts of this case, there is no distinction between Count I, trademark infringement, 15 U.S.C. § 1114(1), and Count II, false designation of origin, 15 U.S.C. § 1125(a). *See Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1475 (11th Cir. Fla. 1991) ("if there is no genuine issue of fact as to trademark infringement, there is none as to unfair competition, either.")). The Defendants are liable to the Plaintiff for the infringement of his right of publicity and the unauthorized publication of his likeness in violation of Florida Statutes §540.08. Defendants are liable to Plaintiff for common law unfair competition and trademark infringement in their use of Plaintiff's G-Unit mark. *See, e.g., American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974) ("The law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.").

**Damages Available for the Infringements:**

As detailed in the Court's Findings of Fact above, Plaintiff brings his claims for infringement of the G-Unit trademark under the Lanham Act, and his claims for the unauthorized publication of his likeness pursuant to Florida Statutes, section 540.08. Each statute provides for certain types of damage awards. Under both statutes, actual damages for unauthorized uses are appropriate. However, disgorgement of the Defendants' profits gained through their infringing actions are only available for the unauthorized use of Plaintiff's G-Unit trademark under the Lanham Act.

The Lanham Act provides that a successful plaintiff is entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117.[8] This recovery is cumulative, that is, the Court may award Plaintiff

---

[8] The damages provision of the Lanham Act, 15 U.S.C. § 1117(a), states:

When a violation of any right of the registrant of a mark registered

12

both its damages and Defendants' profits. *Babbit Electronics, Inc. v. Dynascan Corp.* 38 F.3d 1161, 1182 (11th Cir. 1994). The Lanham Act "vests considerable discretion in the district court. Guided by the principles of equity, the court may award the defendant's profits. Additional extraordinary relief such as treble damages and attorney's fees are available under the statute if the district court believes that such an assessment would be just. The statute also provides for the adjustment of any profits award if it is inadequate or excessive. This remedial accommodation clearly envisions the exercise of the trial judge's discretion." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1495 (11th Cir. Fla. 1983). "[N]o hard and fast rules dictate the form or quantum of relief." *Id.* at 1495 n.11.

Under the Lanham Act, royalties normally received for the use of a mark are the proper measure of actual damages for misuse of the mark. *Boston Professional Hockey Asso. v. Dallas Cap & Emblem Mfg., Inc.*, 597 F.2d 71, 75 (5th Cir. 1979). "The reasonable royalty measure recognizes that, separate from the more traditional damages such as lost sales or declining reputation, trademark infringement deprives the mark's owner of the economic benefit of controlling and licensing the right to use the mark." *American Farm Bureau Fed'n v. Alabama Farmers Fed'n*, 935 F. Supp. 1533, 1549 (M.D. Ala. 1996); *Boston Professional Hockey Asso.*, 597 F.2d at 75. As to an award of the infringer's profits, although a plaintiff may not have suffered any diversion of sales from a

___

in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

defendant's infringing conduct, if the "defendant had wilfully and deliberately infringed . . . awarding an accounting [of the infringer's profits] would further Congress' purpose in enacting 15 U.S.C. Section 1117 of making infringement unprofitable." *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 585 (5th Cir. 1980) (approving the reasoning of *Maier Brewing Co. v. Fleischman Distilling Corp* ., 390 F.2d 117, 121 (9th Cir. 1968)). The Lanham Act requires only that the infringer has acted deliberately or purposely, and the infringer will not be excused for mistake, because "whether he believed himself to be within the law or not, he was knowingly and deliberately cashing in upon the good will of [the registrant]." *Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988) (quoting with approval, as did the Fifth Circuit, *Maier Brewing Co.*). Further, recognizing that a trademark is a protected property right, the *Maltina* Court found that "an accounting is proper even if the defendant and plaintiff are not in direct competition, and the defendants' infringement has not diverted sales from the plaintiff." *Maltina*, 613 F.2d at 585. Such accounting forces the wilful infringer who makes a profit from his conduct to disgorge its unjust enrichment. *Id.*

With regard to the violation of his right of publicity, the Plaintiff is entitled to recover damages for any loss or injury sustained by reason thereof, including an amount which would have been a reasonable licensing fee for the use made of Plaintiff's likeness. Section 540.08, Fla. Stat.; *Weinstein v. Fielder*, 884 So. 2d 990 (Fla. 4th DCA 2004).[9] The proper measure of Plaintiff's actual damages with respect to the right of publicity claim involving Plaintiff's image is the value of what was used based upon all relevant information. In this context, the terms "royalty" and "license fee" are used interchangeably. *See e.g., Weinstein v. Fielder*, 884 So. 2d 990 (Fla. 4th DCA 2004) (awarding license fee to celebrity for use of his image under the "reasonable royalty" provision of § 540.08, Fla. Stat.). "As the term is presently understood, the 'reasonable royalty' measure of damages is taken to mean more than simply a percentage of actual profits. The measure now, very simply, means 'the actual value of what has been appropriated.'" *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 537 (5th Cir. 1974).

**Liability for Damages:**

Each of the Defendants is jointly and severally liable to the Plaintiff for the actual damages

---

[9] Florida Statute, section 540.08 also provides for an award of punitive damages, however Plaintiff is not seeking any punitive damages in this case.

Plaintiff suffered due to the wilful infringements by the Defendants, including damages based upon reasonable license fees for the use of the Plaintiff's likeness and his G-Unit mark. *See, e.g., Babbit Elecs. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994) ("If an individual actively and knowingly caused the trademark infringement, he is personally responsible.") (quoting *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1477 (11th Cir.1991)); *Monsanto Co. v. Campuzano*, 206 F. Supp. 2d 1239, 1247 (S.D. Fla. 2002) ("Trademark infringement is a tort, and any member of the distribution chain is liable as a joint tort-feasor.").

As discussed above, an award of profits is proper when a defendant's actions are wilful. *Maltina Corp.*, 613 F.2d at 585 (5th Cir. 1980). Here, Plaintiff has alleged that Defendants' actions "were done knowingly and intentionally without regard for the rights of 50 Cent . . . ." (Compl., ¶ 35.) Under such facts, now admitted by virtue of the Agreed Order striking Defendants' pleadings as to liability, Plaintiff's recovery of Defendants' profits is proper in order to disgorge the Defendants' unjust enrichment gained through the intentional and unauthorized exploitation of Plaintiff's property rights.

However, consistent with the Lanham Act's cautioning that any damages awarded shall "constitute compensation and not a penalty,"15 U.S.C. § 1117(a), the Court must be careful to fashion an equitable award that is "just, according to the circumstances of the case." *Id.* With this in mind, the Court is persuade by the reasoning in *Sammons v. Colonial Press*, 126 F.2d 341 (1st Cir. 1942).[10] There, considering whether to award profits jointly for a patent infringement, the court stated that

> [a]ccountability for profits is therefore peculiarly personal, as equity acts on the conscience of the infringer. The presupposition is that the infringer has gotten something which it is unconscionable for him to keep; and hence it logically follows that the infringer is accountable only for the profits he received, not for the profits which may have been received by a co-infringer. Of course, when the infringement is by a partnership, the partners are jointly accountable for the whole profit made by the partnership on ordinary principles of partnership law.

---

[10] The Court recognizes that *Sammons* concerned an award of profits for patent infringment. However, in *Sheldon v. Metro-Goldwyn Pictures Corporation*, 309 U.S. 390 (1940), the Supreme Court discussed how profit awards in both patent law and copyright law developed from notions of equity. The same equitable considerations are present in the Lanham Act.

15

*Id.* at 345. The question, therefore, becomes one of partnership or "practical partnership"[11] between the Defendants. If an individual Defendant in this case shared in the profits gained by infringing on the G-Unit mark, then that Defendant should be jointly liable for those profits. However, if a Defendant received no such profits, it would be inequitable to hold that Defendant liable.

Whether the Defendants here were partners sharing in profits "is a fact question for the district court to consider . . . The court should consider whether [the individual defendant] was an employee or an independent contractor rather than a partner. Relevant to this determination, among others, are such factors as whether [the defendant] received a fixed salary or a percentage of profits and whether he bore any of the risk of loss . . . ." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 519 (9th Cir. 1985). The Court has considered all the evidence presented by the parties in this action and, as stated above, finds that Halabe did not share in any of the profits attributable to Defendants' infringement of the G-Unit mark. Halabe received a fixed salary as an employee of Grupo. While Halabe is the Director Generale (CEO) of Grupo, his uncontradicted testimony is that he did not share Coco Bongo's profits, nor did he share any of the risks associated with the operation of the nightclub. As to Noble and Grupo, the Court finds that they shared in the profits generated through the operation of the Coco Bongo. Therefore, liability for profits awarded Plaintiff will be joint and several as to Grupo and Noble, but not as to Halabe.

**Royalty/License Fee Damages:**

There is no specific formula to establish the value of an intangible property interest such as name and likeness. *King v. Ames*, 179 F.3d 370, 376 (5th Cir. Tex. 1999). "[L]ike 'goodwill' in a business, one's name and likeness is an intangible property interest which is not susceptible of proof with mathematical exactitude." *Id.* "In general, an owner is competent to give his opinion on the value of his property. However, such testimony cannot be based on naked conjecture or solely speculative factors." *Id.* (internal quotation and citation omitted).

"Where the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, plaintiff may recover upon a showing of the extent of damages as a matter of just and reasonable inference, although the result may be only an approximation." *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986) (quoting *Story Parchment Company v.*

---

[11] *See Belford, Clarke & Co. v. Scribner*, 144 U.S. 488 (1892), which established the "practically partners" doctrine when considering an award of shared profits.

*Paterson Parchment Paper Company*, 282 U.S. 555, 563 (1931)). "The fundamental principle of the law of damages is that the person injured by breach of contract or by wrongful or negligent act or omission shall have fair and just compensation commensurate with the loss sustained in consequence of the defendant's act which gives rise to the action." *MCI WorldCom Network Servs. v. Mastec, Inc.*, 995 So. 2d 221, 224 (Fla. 2008) (citation and quotation omitted). To that end, "[g]reat latitude is given the trial judge in awarding damages, and his judgment will not be set aside unless the award is clearly inadequate." *Drake v. E. I. Du Pont de Nemours & Co.*, 432 F.2d 276, 279 (5th Cir. 1970).

In the present case, the Court heard testimony from both the Plaintiff and from his attorney, Sedlmayr, as to the value of Plaintiff's likeness and his G-Unit mark. Sedlmayr has represented Plaintiff for over eight years, and testified that he has negotiated upwards of twenty-five consummated agreements on Jackson's behalf involving personal endorsements, branding, and licensing. Plaintiff and his transactional attorney did not offer any agreement of similar use to that of the Defendants' infringing use in this case. However, they did give reasoned estimations of what they would require in an agreement involving uses similar to Defendants' infringing uses here, if they had been given an opportunity to negotiate such an agreement. Sedlmayr testified at length as to the various factors that he and Plaintiff consider when entering into endorsement/branding deals (these factors are detailed in the Findings of Facts above). He then testified about how he compared the factors present in Plaintiff's various agreements to the factors present in the involuntary "deal" foisted upon Plaintiff in this case. The Court finds that the testimony of both Jackson and Sedlmayr as to the value of Plaintiff's mark and image, though not conclusive, is credible and informative, and not based on pure conjecture or speculation. Accordingly, contrary to Defendants' objections, this testimony evidence, coupled with the other documentary evidence provided by Plaintiff, including the infringing advertisements themselves, is sufficient for the Court to determine the value of Plaintiff's property.

Based on the evidence presented at trial, the Court concludes that all Defendants are jointly and severally liable to Plaintiff for two hundred thousand dollars ($200,000.00) as a reasonable royalty for their infringing use of his likeness. Additionally, all Defendants are jointly and severally liable to Plaintiff for twenty-five thousand dollars ($25,000.00) as a reasonable royalty for their infringing use of his G-Unit trademark.

The Court has considered all the evidence when arriving at this damage award, however there

17

are several specific factors the Court wishes to address to help the parties better understand how it came to the values above.

As stated in the Findings of Fact, Plaintiff's likeness and the G-Unit mark are both valuable. However, Jackson's likeness is significantly more valuable than the G-Unit symbol. In this case, although Defendants have infringed on both Jackson's likeness and his G-Unit mark, the likeness of Jackson as 50 Cent was the primary focus of their infringing use. Indeed, in many places where Jackson's misappropriated likeness and the G-Unit mark are used, the G-Unit mark is only partially visible. The Court also notes the limited scope of Defendants' use of Plaintiff's likeness and G-Unit mark. The Court, on its own request, viewed the Infringing Advertisement and Infringing Video. When the scrolling advertisement begins, Jackson's likeness and the G-Unit mark are not the first panel to appear, but rather the fifth. The same is true of the Infringing Video. In both the Infringing Advertisement and the Infringing Video, the G-Unit symbol is not predominantly displayed, and Plaintiff's likeness and the G-Unit mark are shown for only a few seconds. Additionally, as far as the Infringing Video is concerned, the website users are not presented with the video upon accessing the Coco Bongo website, but instead have to navigate to a third-party website, where they then have to select the video from a list.

Plaintiff's transactional attorney testified about many factors used in arriving at his proposed valuation for the use of Jackson's image and the G-Unit mark. One of these significant factors is the "deliverables" required of Jackson in any agreement. Here, as just described, the deliverables were minimal. The Defendant's use of Plaintiff's likeness and his G-Unit mark was limited to a static image of Plaintiff wearing the G-Unit mark, appearing for five-seconds, in one panel of a seven-panel scrolling advertisement and video. Were Plaintiff to have negotiated the substantial licensing fee he seeks in this case with Defendants, the Court finds that the use of Plaintiff's likeness and G-Unit mark would have been far broader than it was here. Further, Plaintiff's valuation of the use of his image and the G-Unit mark does not adequately account for the fact that the Infringing Advertisement was of limited duration and had its greatest value when being used during the Spring Break 2007 promotion. Once the promotion was finished, the value of the infringing advertisement had diminished, residual value. Significantly, Plaintiff's mark, unlike in many infringement cases, was not placed on a specific product for sale.

Additionally, although Plaintiff and Defendants could have negotiated for the extent to which Plaintiff's image and his G-Unit mark could have been used on the Coco Bongo website, the

evidence presented at trial shows that it is not practicable to restrain access to the Coco Bongo website only to internet users within the state of Florida. The Court therefore finds that had the Plaintiff been given an opportunity to negotiate a licensing agreement with Defendants to use his image and G-Unit mark in an online advertisement, any such deal would have been for the nationwide use of Plaintiff likeness and G-Unit mark. Accordingly, the damage award above is for a reasonable royalty for the use of Plaintiff's image and G-Unit mark across the whole of the United States.[12]

**Profit Damages:**

Plaintiff is entitled to an award of profits for the infringing use of his trademark only. *Compare* 15 U.S.C. § 1117, *with* Section 540.08, Fla. Stat. The entitlement to profits under the Lanham Act, however, is "subject to the principles of equity . . . ." *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 584 (5th Cir. 1980); 15 U.S.C. § 1117(a) ("If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."). As stated above, the Lanham Act provides that any damages awarded shall "constitute compensation and not a penalty," 15 U.S.C. § 1117(a), the Court, therefore, must be careful to fashion

---

[12] **Note on Licensing Fee or Reasonable Royalty Limited to Florida Only**:

As discussed, when determining the proper damage award, the Court considered the particular facts an circumstances of this case, including the practicalities of the commercial setting in which Plaintiff's likeness and mark was used. *See, e.g., University Computing Co. v. Lykes- Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974). Here, the infringing use by Defendants occurred via advertisements posted on the internet. The internet is a medium which does not lend itself to geographic compartmentalization, unlike, for example, an advertisement in a local newspaper. What this means is that on the unique facts of this case Plaintiff would have negotiated a deal for nationwide use of his image. Accordingly, as stated above, the damages awarded are for a reasonable royalty for the use of Plaintiff's image and the G-Unit mark across the whole of the United States. However, should it be subsequently determined that an award for damages should be limited to the boundaries of Florida, the Court approximates that such damages within Florida only to be thirty-three thousand dollars ($33,000.00) for the infringing use of Plaintiff's likeness, and four thousand one hundred twenty-five dollars ($4,125.00) for the infringing use of the G-Unit trademark.

The Court arrived at these values by taking the ratio of Florida's population to that of the total population of the United States (approximately 16.5%), and discounting the damages award accordingly. The Court used the population numbers for the year 2007 as provided by the U.S. Census Bureau located at: http://factfinder.census.gov/.

an equitable award that is "just, according to the circumstances of the case." *Id.*

For an award of profits, Plaintiff need only "prove the infringer's sales. The burden then shifts to the defendant, which must prove its expenses and other deductions from gross sales." *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488 (11th Cir.1987). When interpreting section 19 of the Trade-Mark Act of 1905 (substantially identical to that of the succeeding Lanham Act), the Supreme Court refused to place the burden of apportionment on the plaintiff. *Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 206-07 (1942). The Supreme Court stated that

> [i]f it can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of the defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol, the burden of showing this is upon the poacher. The plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark. The burden is the infringer's to prove that his infringement had no cash value in sales made by him.

*Id* (internal citations omitted). The Supreme Court recognized that under such a rule "[t]here may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer." *Id.* at 207. Accordingly, a court may award all profits made during the infringing period, unless the infringer can prove that at least some of these profits flow from his own merit rather than from infringement of the plaintiff's mark.

Plaintiff takes the position in this case that all profits should be awarded to him because Defendants' concede, via Halabe's trial testimony, that it is virtually impossible to apportion the profits attributable to Coco Bongo's own merit, such as Coco Bongo's reputation, location, unique concept, and other legitimate advertising campaigns, from those attributable to the infringement of Plaintiff's trademark. While the Court might have the discretion under the Lanham Act to award Plaintiff all of the Coco Bongo nightclub's profits earned during the infringing period, in the exercise of its discretion, given that the profits are overwhelmingly attributable to factors other than the limited use of Plaintiff's G-Unit mark, the Court finds that such an award would be inequitable.

The Coco Bongo nightclub is one of Cancun's top tourist attractions and is located in the heart of Cancun's tourist entertainment zone. The nightclub is widely known throughout the tourist industry as a top attraction, with many travel-related websites referring visitors to the Coco Bongo

nightclub. The nightclub was profitable before the infringing use of the G-Unit mark, and increased in profitability well after the G-Unit mark was removed from the Coco Bongo website. The nightclub advertises extensively in Mexico and on the internet, independent of any infringing uses of Plaintiff's G-Unit mark. Add to these factors that the infringing use of the G-Unit mark was limited to an internet advertisement with the G-Unit mark only partially visible in most cases, and it is certain that the Coco Bongo nightclub's profits significantly flow from the club's own merit rather than from the infringement of Plaintiff's mark.

Furthermore, an equitable apportionment of profits is especially required here given the unique circumstances of this case. Here, the G-Unit mark was not used in connection with the sale of any specific infringing product bearing Plaintiff's mark, unlike the more common trademark infringement cases where, for example, infringing clothing, watches, or shoes are sold. In the more common trademark infringement cases, not only is the infringer unjustly enriched, the infringing sales directly detract from the market for the licensed products—accordingly, every infringing product sold may be a legitimate sale lost. In such cases it is therefore reasonable to attribute the infringer's profits to the sale of the infringing products, thus "further[ing] Congress' purpose in enacting 15 U.S.C. Section 1117 of making infringement unprofitable" *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 585 (5th Cir. 1980). Here, however, there is no correlation between the infringing use of Plaintiff's G-Unit mark and the sales at the Coco Bongo nightclub.[13] Rather, there is the limited use of Plaintiff's mark, coupled with the substantial factors overwhelmingly contributing to Coco Bongo's profits independent of the Infringing Advertisement, making disgorgement of all of Coco Bongo's profits inequitable.

In sum, the Court concludes that the limited use of the G-Unit trademark, in the rather unusual situation presented here, had minimal effect on the generation of profits at the Coco Bongo nightclub. *See, e.g., Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1549 (9th

---

[13] The Court is aware that "an accounting is proper even if the defendant and plaintiff are not in direct competition, and the defendants' infringement has not diverted sales from the plaintiff." *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 585 (5th Cir. 1980). As stated above, however, the Court is equally aware that the Lanham Act provides for an equitable approach to the award of damages. 15 U.S.C. § 1117(a). To the extent that the Court's discussion relates to the lack of direct competition between the parties, it does so only to underscore the unique circumstances in the present case, which require the Court to exercise its discretion in order to fashion a just and non-punitive award. In some cases, disgorgement of all the infringer's profits may be proper, however such is not the case here.

Cir. 1989) (in copyright case, district court properly considered whether "costumes, scenery or performers" outweighed the use of the copyrighted materials as the reason for the infringers' profits.). The Court is conscious that any profits received by Defendants Grupo and Noble through their wilful infringement of the G-Unit mark should be disgorged, and that, generally, when a precise accounting is not possible, any uncertainty should be determined in the innocent party's favor rather than the infringer's. However, here, the profits are overwhelmingly attributable to factors other than the Defendants' infringing use of Plaintiff's G-Unit mark. The Court therefore concludes that it would be unjust and punitive to award the total of Coco Bongo's profits to Plaintiff when the G-Unit mark minimally contributed to the generation of those profits. The facts are that Coco Bongo was and is a very popular and profitable business irrespective of the Defendants' infringement of Plaintiff's G-Unit mark. Taking all this into account, the Court finds that the amount of profits directly attributable to the infringing use of Plaintiff's G-Unit mark to be, at most, one percent of the profits attributable to patrons from the United States. Accordingly, considering all the evidence and the factors contributing to the profits generated at the Coco Bongo nightclub from February 22, 2007 through September 1, 2007, the Court concludes that Defendants Grupo and Noble are jointly and severally liable to Plaintiff for two thousand six hundred sixty-five dollars and seven cents ($2,665.07) as the amount of profits attributable to the wilful infringement of the G-Unit mark.[14]

**Attorney's Fees and Costs:**

Plaintiff seeks an award of attorney's fees pursuant to 15 U.S.C. § 1117(a), which specifies that a court may award attorney's fees "in exceptional cases." The Eleventh Circuit has defined an exceptional case as a case "where the infringing party acts in a malicious, fraudulent, deliberate, or willful manner." *Burger King Corp. v. Pilgrim's Pride Corp.*, 15 F.3d 166, 168 (11th Cir. 1994) (internal quotations omitted). "Although a case may rise to the level of exceptionality, the decision to grant attorney fees remains within the discretion of the trial court." *Id.* As previously discussed, the striking of Defendants' pleadings as to liability established that Defendants acted willfully when infringing Plaintiff's G-Unit trademark. The striking of the pleadings also established that

---

[14] The Court arrives at this value by taking the total of the Coco Bongo nightclub's profits during the infringing period from February 22, 2007 through September 1, 2007 of $410,010.70, and then discounting this value by thirty-five percent in order to account for those profits received from non-United States tourists. This leaves a value of $266,506.96, representing the Coco Bongo nightclub's profits attributable to United States tourists during the period of infringement. One percent of this value is $2,665.07.

Defendants' actions were done "knowingly and intentionally without regard for the rights of [Plaintiff] . . . ." (Compl. ¶ 35.)  Given this intentional infringement without regard for the rights of Plaintiff, the Court finds it appropriate to award attorney's fees to Plaintiff, who would not have incurred the legal fees in bringing this suit to protect his property rights were it not for the wilful conduct of Defendants.  Accordingly, considering the facts of this case, the Court determines that an award of attorney's fees pursuant to the Lanham Act is warranted.

## CONCLUSION AND FINAL JUDGMENT

For the foregoing reasons, its hereby ORDERED and ADJUDGED that

FINAL JUDGMENT is entered in favor of Plaintiff and against Defendants as follows:

a. Defendants, Grupo Industrial Hotelero, S.A., Roberto Noble, Sr., and Isaac Halabe are jointly and severally liable to Plaintiff, Curtis James Jackson, in the amount of two hundred twenty-five thousand dollars ($225,000.00) as a reasonable royalty/license fee for the infringing use of Plaintiff's likeness and his G-Unit trademark, for which let execution issue.

b. Defendants, Grupo Industrial Hotelero, S.A. and Roberto Noble, Sr. are jointly and severally liable to Plaintiff, Curtis James Jackson, in the amount of two thousand six hundred sixty-five dollars and seven cents ($2,665.07) as a disgorgement of profits earned from the infringing use of Plaintiff's G-Unit trademark, for which let execution issue.

c. Defendants, Grupo Industrial Hotelero S.A., Roberto Noble, Sr., and Isaac Halabe are jointly and severally liable to Plaintiff, Curtis James Jackson, for the payment of his reasonable attorney's fees.  The Court retains jurisdiction over this action in order to determine the reasonable attorney's fees in this case at a later date by appropriate motion of Plaintiff.

The Clerk shall close this case, and all pending motions are denied as moot.

DONE AND ORDERED in Chambers, Miami, Florida, April 28, 2009.

Paul C. Huck
United States District Judge

Copies furnished to:
All counsel of record

23